UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | | |
|---|---|---|
| KRISTINE LLOYD; and JULIUS MENA, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | **NO. C 18-05176 JD** |
| EAZE SOLUTIONS, INC., | ) ) | |
| Defendant. | ) ) ) | |

San Francisco, California
Thursday, December 5, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        HEDIN HALL LLP
        Four Embarcadero Center, Suite 1400
        San Francisco, California 94111
**BY:**  **DAVID W. HALL**
       **FRANK S. HEDIN**
       **ATTORNEYS AT LAW**

For Defendant:

        BOIES SCHILLER FLEXNER LLP
        725 South Figueroa Street, 31st Floor
        Los Angeles, California 90017
**BY:**  **MICHAEL D. ROTH**
       **ALBERT Q. GIANG**
       **ATTORNEYS AT LAW**

Reported By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
          Official Reporter, CSR No. 7445

                        P R O C E E D I N G S

                           ---o0o---

     **THE CLERK:**  Calling Civil Action 18-5176, Lloyd versus
Eaze Solutions Incorporated.

     Counsel, please step forward and state your appearances
for the record.

     **MR. HEDIN:**  Good morning, Your Honor.  Frank Hedin for
the plaintiffs.

     **MR. ROTH:**  Good morning, Your Honor.  Michael Roth for
defendant Eaze Solutions, Inc.  With me -- here with me today
is Albert Giang.

     **THE COURT:**  All right.  Well, we're here on Round 2.
I turned down the first preliminary request for settlement
approval because there were a host of problems.  I think some
of those have been addressed, but now new ones have come up.
So I feel like I'm choking a snake.  I just can't get you guys
to get this thing done.

     So here's where we are.  Let me just tell you where we
are.  First, somehow uncashed checks are now reverting to the
defendant.  I mean, I have it in my standing order, you just
don't do that.  So I'm denying approval on that basis alone.

     You didn't do it last time.  I don't know what happened.
Now, all of a sudden, it's reverting.  So somebody made some
decision somewhere, because last time it was going to go to

1   Epiq, which was personally fine if there's any *cy pres* money.

2   But I will not approve anything that sends a penny back to a

3   defendant.  That's just nuts.  That's nuts.  So approval is

4   going to be denied on that basis.

5        Here are some other things that you need to take a look

6   at.  The fees for the administrator have gone way up.  I don't

7   understand that.  I mean, the scope of work is the same.  And I

8   don't understand why that money -- if there's extra money to be

9   paid, I know Eaze is paying it directly; but even so, that's

10  money, at least indirectly, out of the pockets of the

11  claimants.  So --

12       **MR. HEDIN:**  May I be heard on that?

13       **THE COURT:**  -- why did that happen?

14       **MR. HEDIN:**  Well, the reason the cost increased is

15  because there's several more reverse-lookup rounds in order to

16  pinpoint exactly what the addresses currently are for these

17  people.

18       Additionally, because checks are going to be sent -- at

19  least under the proposed framework, would be sent automatically

20  to every single class member for which an address is located,

21  which is currently 96 percent, the postage and the printing and

22  mailing costs are just higher in connection with the

23  disbursement process.

24       **THE COURT:**  So it's close to a $55,000 increase.  I

25  mean, that's like a 40 percent increase.  That's for postage?

1    **MR. HEDIN:**  I believe that's the maximum.  The 255,000

2    is the maximum projected.  The settlement administrator, in

3    their declaration, indicated that it's projected to be a range

4    somewhere between -- I think it's 165 to 255.  And so it's not

5    necessarily going to be on the high end.

6        **THE COURT:**  255?

7        **MR. HEDIN:**  255 is the high end.

8        **THE COURT:**  I'm not approving that.  I'll cap this out

9    maybe at 225, but I'm not satisfied about why there's been

10   what's close to a 40 percent increase between two filings for

11   admin costs.

12       **MR. ROTH:**  Your Honor, if I could address that --

13       **THE COURT:**  Yes.  Go ahead.

14       **MR. ROTH:**  -- one moment.

15       **THE COURT:**  Sure.

16       **MR. ROTH:**  The claims administrator's estimate was

17   actually at the low end of that.  I think it was 168, which

18   they had previously capped the amount; and when we asked them

19   to cap it at 168, they were concerned because of the reverse

20   lookups and the increased --

21       **THE COURT:**  There's a what?

22       **MR. ROTH:**  Because of the additional reverse address

23   lookups and the additional postage.  And so even though they

24   were estimating 168, we asked them to include a cap.

25       So the 255 was the outer limit.  Their estimate is

1    actually at the low end of that, which is -- I think it was

2    168.

3         **THE COURT:**  All right.  Well, I'm not going to approve

4    a cap of 255.  I'm not going to do that.  That's way too high.

5    So you'll need to work out something else.

6         And on the attorneys' fees, I know the punchline stays the

7    same.  But last time you told me your lodestar was 93,000.

8    This time you're telling me your lodestar is 235,000.

9         **MR. HEDIN:**  There was an extraordinary amount of

10   back-and-forth that went on between the time the initial

11   settlement approval papers were denied and the time we reached

12   the amended one and were able to memorialize it and work with

13   the claims administrator, put this entire plan together.

14        This was an extremely time-consuming process involving

15   well over a dozen phone calls with the claims administrator,

16   more than that with opposing counsel, to negotiate the terms

17   with the mediator.  It was a very long, long process.  And...

18        **THE COURT:**  I just don't get that.  I mean, you spent

19   93,000 from preparation of the complaint, complaint, discovery,

20   to the first rejected settlement.  Then you spent almost twice

21   that much on the second settlement alone.  How is that

22   possible?

23        **MR. HEDIN:**  Because it was an extremely time-consuming

24   process going back and forth with the settlement administrator

25   about how we're going to get the addresses for the initial

**PROCEEDINGS**

1   people, how we're going to do reverse lookups for the next

2   batch to figure out where those people reside today.  There was

3   negotiation over every aspect of this.  And it's all accounted

4   for, Your Honor.

5         **THE COURT:**  It took 200 hours to do that?  That's what

6   you have here.  You spent 168.5 for the whole case, and then

7   you spent 361.5 just for the revised motion.  That's a 200-hour

8   gap, basically.  It took that long?

9         **MR. HEDIN:**  Yes, Your Honor.

10        **THE COURT:**  And your hourly rate went up a hundred

11  bucks too.  How did that happen?

12        **MR. HEDIN:**  Because we hadn't -- neither my partner

13  nor I had increased our hourly rate in the previous two years,

14  and so we made an adjustment.  That's our current hourly rate.

15  And so the lodestar is factored based on that.

16     We could provide the Court with an amended figure.

17        **THE COURT:**  The fees will be decided at the final

18  hearing.  I'm just telling you, I'm going to have some

19  concerns.

20     Okay.  And 50 bucks --

21        **MR. ROTH:**  Your Honor, excuse me.

22        **THE COURT:**  Yes.

23        **MR. ROTH:**  I'm sorry.  The fee estimate doesn't

24  include any of those hours or the increase.  It's all based on

25  the pre first settlement amount.

1    **THE COURT:** I know -- that's what I said. I know the

2  punchline is the same. I just don't like it when I see

3  the -- the roof is the same. I don't like it when I see the

4  whole bottom three stories being rearranged massively.

5    **MR. ROTH:** I understand.

6    **THE COURT:** It makes me concerned that something is

7  not right.

8    **MR. ROTH:** I understand, Your Honor.

9    **THE COURT:** These numbers are wildly different. I

10  don't mind a little plus or minus 10 or 15 percent. I get

11  that. But a plus or minus 140 hours -- that's twice as much

12  time, almost, as the first round -- for the whole case, that's

13  a red flag to me. I hope you understand that.

14    **MR. ROTH:** Yes, Your Honor. Thank you.

15    **THE COURT:** Now, let's get to the real punchline, and

16  that is the $50 per head. I mean, that's 10 percent of what

17  the statute awards.

18    **MR. HEDIN:** And that is -- comparatively, compared to

19  other TCPA settlements that have been approved by courts across

20  the country, that is an excellent result.

21    **THE COURT:** Well, this is not criminal sentencing

22  where I'm worried about treating similar defendants in a

23  non-disparate fashion.

24    You're here with me, and I don't understand why there's a

25  90 percent discount. This is a lock and solid case. Okay?

1    You've got a bunch of people who never signed up with the

2    defendant who got texts.  It doesn't get any easier than that.

3    Why are you discounting that recovery by 90 percent?

4         **MR. HEDIN:**  Well, Your Honor, as we outline in the

5    papers, there are substantial risks that exist going forward,

6    including the potential for the FCC to issue a rulemaking.

7         **THE COURT:**  I understand that.  Okay.  So maybe that's

8    20 percent.  Why 90?

9         **MR. HEDIN:**  There's also the potential of the Supreme

10   Court granting cert in one of the pending petitions before it

11   concerning the circuit split on the ATDS definition.

12        **THE COURT:**  Well, if you're going to discount on the

13   probability of cert, you should be down about a 1 percent

14   discount because that's about the grant rate for cert

15   petitions.  I don't know that for true, but I just know that

16   it's a blue moon when a cert petition is granted.  So that is

17   not a 90 percent basis either.

18       You've got to tell me why -- this is a huge discount.  I

19   mean, immaterially -- not "immaterially" -- incomprehensibly

20   large.  And I understand there's always uncertainty.  Of

21   course.  That's why you settle.  But even if the FTC whacks you

22   and the Supreme Court comes down like a ton of bricks, you've

23   assumed a 90 percent probability that's going to happen.  I

24   don't see that to be rationally supported.

25        **MR. HEDIN:**  Your Honor, even -- one of the two class

1    members, one of the two named plaintiffs, Mr. Mena, actually

2    signed up for Eaze's services after he received the subject

3    text messages.

4        Your court -- since we filed the preliminary approval

5    motion the first time around, Your Honor granted a motion to

6    compel arbitration in the other related *Williams versus Eaze*

7    case.

8        **THE COURT:**  Well, of course, because they had

9    contracts with an arbitration clause.  Your clients, by

10    definition, do not because they were never --

11        **MR. HEDIN:**  They did not --

12        **THE COURT:**  -- doing business with the defendant.

13        **MR. HEDIN:**  They did not at the time they received the

14    text messages.  But Mr. Mena subsequently became a customer of

15    Eaze's and does have a contract to arbitrate, as does a large

16    percentage of the class.  And so these are additional issues

17    that would have presented serious obstacles at class cert on a

18    contested basis should the case have gotten that far.

19        There are several litigation risks in this case that we

20    felt, based on our judgment and our experience in this area,

21    that warranted a discount of this size.

22        And it's a settlement that provides per text monetary

23    relief automatically to every class member.  As far as I know,

24    there's not any TCPA settlement that's ever provided per text

25    relief automatically to every class member.  We think it's an

1  excellent --

2      **THE COURT:**  I don't understand that arbitration issue.

3  Tell me that again.

4      **MR. HEDIN:**  So Mr. Mena, after he received the

5  messages alleged in the complaint in this case, approximately a

6  year later signed up for Eaze's services and is subject to an

7  arbitration provision.

8      Eaze contends that the arbitration provision can actually

9  apply retroactively to cover claims that accrued before the

10  contract to arbitrate was entered into.  Plaintiffs disagree.

11  But the Court could -- it's unclear how the issue would have

12  been resolved by the Court.  It's also unclear how that issue

13  would have affected class certification.

14      And this is an issue that affected a large number of these

15  potential class members because, when people received the

16  texts, some of them did, in fact, sign up for Eaze's services.

17      **THE COURT:**  I'm sorry.  It just doesn't add up to a

18  90 percent haircut.  I just don't get it.  I mean, these are

19  relatively straightforward issues.  There might be a change in

20  the law.  There's an arbitration dispute, some uncertainty

21  about class cert.  That's run of the mill for preliminary

22  approval.

23      This is one of the steepest discounts I've ever seen on

24  the bench.  And I know that because the statute tells you how

25  much each person is entitled to.

**PROCEEDINGS**

1       **MR. HEDIN:**  Your Honor, in most of these cases, if you

2   looked at the total number of texts sent and you multiplied --

3       **THE COURT:**  It makes me wonder why we're -- other than

4   generating fees, what is the benefit of this?  We're tying

5   people's hands.  They can't go out and make their own claim.

6   And we're saying, "Here is 50 bucks.  Take it or leave it."

7       **MR. HEDIN:**  Well, they can absolutely opt out and make

8   their own claim.  And we think this is meaningful relief.

9   These are text messages.  We think the settlement is in the

10  high end of comparable settlements, and it's well within the

11  range of reasonableness at preliminary --

12      **THE COURT:**  I'm going to tell you something.  I got a

13  hundred bucks because I was in some class out of Georgia for a

14  call that I don't even remember.  It was, like, one call.  That

15  was Georgia, and they gave me a hundred dollars, no questions

16  asked.  I just got a check in the mail.

17      So you may cherrypick a couple of settlements here and

18  there, but I don't think you're accurately portraying what the

19  full and complete range of these types of settlements are.

20      **MR. ROTH:**  Your Honor, if I may.

21      **THE COURT:**  Yes.

22      **MR. ROTH:**  We provided a list of approximately 25

23  other settlements that puts it in the range, including one that

24  involved exactly the same third-party vendor who sent texts.

25  And this is far more relief than was the final approval in that

1   case.

2        **THE COURT:**  Look, I'm not going to do a forensic

3   analysis of how this case differs.  I'm going to do what I have

4   in front of me.  And I'm having a hard time swallowing

5   90 percent.  So I'll let you make your final statement about

6   why I should do that.

7        **MR. HEDIN:**  Your Honor, there's a number of litigation

8   risks.  There's inability to pay issues potentially.  There's

9   bankruptcy issues.

10       **THE COURT:**  Bankruptcy?

11       **MR. HEDIN:**  Well, potentially a $90 million class-wide

12  judgment.  It's unclear how the legal landscape is going to

13  change for Eaze's business going forward.  That could

14  potentially result in the case having a judgment for the

15  plaintiff and the plaintiff class in excess of what Eaze could

16  pay.

17      There's just a number of substantial risks going forward

18  in terms of the landscape with the FCC, with the Supreme Court

19  that could evolve in Eaze's favor and result in absolutely no

20  relief to the class.

21       **THE COURT:**  Was bankruptcy mentioned in your

22  preliminary approval motion?

23       **MR. HEDIN:**  It was mentioned, not in detail because we

24  were unable to get the specific financial details from Eaze.

25  But publicly available information reveals that the company's

1   valuation has gone down substantially in recent months and

2   that --

3          THE COURT:  Where is that in the motion?  I'm looking

4   at Docket Number 43.

5          MR. HEDIN:  Just one minute, Your Honor.

6      Page 20.

7          THE COURT:  20.  Which line?

8          MR. HEDIN:  Page 20 at Point 4, the fourth point.  I

9   mean, this is our only reference to the potential bankruptcy

10  issue.

11         THE COURT:  It doesn't say anything.  It just says

12  there's a case that says watch out for bankruptcy.  You didn't

13  give me any facts about that.

14     So what's going on with Eaze?  Are you all in financial

15  peril?

16         MR. ROTH:  I don't think the company is in financial

17  peril, but a $90 million judgment would certainly change the --

18         THE COURT:  We're not talking full freight.  Something

19  less than a 90 percent discount.  But you're not -- all I need

20  to know is, is your representation to me that Eaze is on the

21  edge of bankruptcy or not?

22         MR. ROTH:  I'm sorry.  I have not made that

23  representation.

24         THE COURT:  No.  I'm just asking.  Is it or not?

25         MR. ROTH:  I don't believe the company's on the edge

1  of bankruptcy.

2      **THE COURT:** All right. So that's really not a factor.

3      **MR. ROTH:** I think when you're looking at the full

4  liability here, then it is a consideration.

5      **THE COURT:** We're not -- it's compromising. Please,

6  let's be clear. I'm not issuing summary judgment awarding full

7  liability. All I'm saying is, the 90 percent figure is a

8  free-floating, apparently arbitrarily selected discount to get

9  this settlement through, and I don't like it.

10     So I'm trying to figure out whether Eaze can pay more.

11 Your colleague here is telling me you're teetering on the edge

12 of financial ruin; you can't pay any more. And I'm asking you

13 to see if that's true, and I'm hearing that that's not true.

14 Maybe if it was 90 million full-freight victory, maybe there's

15 an issue; but you're not telling me, short of that, it's going

16 to be a problem.

17     **MR. ROTH:** I am not telling you that. I also disagree

18 that this was an arbitrary figure. I think that --

19     **THE COURT:** Then you tell me what the basis is. How

20 did you quantify these relatively routine risks to be

21 90 percent?

22     **MR. ROTH:** Sure. We looked at the fact that there was

23 a third-party vendor who was acting outside the scope of

24 authority. We looked at another case where there was a

25 settlement involving exactly the same issue. We looked at

1   standing problems with both of the two plaintiffs.  We

2   evaluated over 20 --

3           **THE COURT:**  Standing problems?  What's the standing

4   problem?

5           **MR. ROTH:**  Well, you have two plaintiffs and two

6   buckets of texts.  One of them signed an arbitration clause.

7           **THE COURT:**  Later.

8           **MR. ROTH:**  Yes, which applies to --

9           **THE COURT:**  Not when he --

10           **MR. ROTH:**  We don't look at --

11           **THE COURT:**  Not when he received -- one at a time.  I

12   go first.

13      Not when he received the texts.  He was not bound by

14   arbitration when he received the texts.

15           **MR. ROTH:**  I agree with that.  But what he signed was

16   a prospective agreement saying he would arbitrate any of his

17   forward-looking disputes.

18      And you have a second plaintiff who didn't receive the

19   vast majority of the type of texts that this case concerns.

20      There are two buckets of texts, and the other one is in a

21   bucket that concerns about 5,000 texts.  And the gentleman who

22   signed the arbitration clause is in the bucket of the 45,000

23   other texts.

24      The case has been pending for well over a year without a

25   plaintiff who actually didn't sign an arbitration clause and

1  was a recipient of those texts.

2       And we also looked at *Marks* and all of the cases across

3  the country that have disagreed with the holding in *Marks*.  The

4  FTC's actions --

5       **THE COURT:**  It doesn't matter.  *Marks* is the law of

6  the circuit.  So...

7       **MR. ROTH:**  It is, but it's also --

8       **THE COURT:**  Not the first time that we have taken a

9  unique view.

10      **MR. ROTH:**  But we also are --

11      **THE COURT:**  I'm not even sure it's unique.  But, in

12  any event, it's the law of circuit.  So...

13      **MR. ROTH:**  We understand it's the law of the circuit,

14  but it also is the subject of a petition to the Supreme Court

15  and under review.

16      **THE COURT:**  Do you know how many cases every year are

17  subject to a petition to the Supreme Court?  I've got, like,

18  half a dozen right now.  I guarantee you, none of them are

19  going to be granted because it just doesn't happen.  They take

20  80 cases a year, roughly.

21      **MR. ROTH:**  I understand the percentages.  I think this

22  is in a higher percentage than the normal.  But we did look at

23  a lot of factors.  This wasn't an arbitrary number that was

24  pointed out.  And we looked at your prior ruling and the

25  comments you made from the bench and, basically, doubled the

1    number.  I mean, there was a significant increase.

2          **MR. HEDIN:**  And, Your Honor, just one last point on

3    the risks going forward.  On page 20 of our brief, we cite to

4    *Golan versus Veritas Entertainment*, which is a case pending

5    before the Eastern District of Missouri, in which the Court

6    remitted a $1.6 billion judgment for a TCPA class to

7    32 million, $10 a call.  The Eighth Circuit -- on due process

8    grounds.  And the Eighth Circuit recently affirmed that

9    decision in its entirety.

10        And so the possibility of any class-wide award being

11   remitted, you know, to even an extent similar to that, in the

12   ballpark of that is a further factor that weighs in favor of

13   finding the 50 per text reasonable in this case.

14         **THE COURT:**  I'm just not hearing anything that

15   persuades me this is a fair deal for the class, 50 bucks, when

16   the statute says Congress has determined this is a $500

17   offense.  Congress has said this is worth $500 to each person,

18   and you're coming in and saying it's worth 10 percent of that.

19   And I'm really having a hard time understanding how you could

20   come to that conclusion.

21        I understand the risks.  There are risks in every case.

22   That's why cases settle.  It's a fair thing to do.  Take it

23   into account.  So maybe 500 becomes 300 or 250.  But it's

24   really hard for me to see -- and I'm not hearing anything that

25   tells me -- how going from 500 to 50 is a good deal for this

1  class when it's crystal clear none of them are doing business

2  with Eaze, Eaze had no right to send them the texts, and they

3  got them.

4      **MR. HEDIN:**  There are --

5      **THE COURT:**  What's really a driver here for me is

6  there isn't much in the way of a material dispute about the

7  facts.  I mean, other than the fact that most people are not

8  aware or sophisticated enough or engaged enough or had the

9  confidence enough to file a claim, they'd all be getting $500.

10  They'd be sending letters to Eaze saying, "Where's my $500?"

11      And I don't want them to receive a notice from this Court,

12  with this Court's name on it, saying, "I'm sorry.  We've

13  discounted your claim to 50."  If they came to my courtroom and

14  looked me in the eye, I would have trouble telling them why I

15  approved that, because I'm not hearing anything that gives me a

16  lot of ammunition to tell an aggrieved class member, "I'm

17  sorry.  Here's what the Court decided to do."

18      **MR. HEDIN:**  There's a market -- a pretty

19  well-established market for these types of settlements with

20  cases involving very similar facts.  And in most of those

21  cases, you're dealing with millions of texts.  And if you were

22  to multiply that number of texts in just about every other TCPA

23  case that we cited by 250 or 300 dollars, you'd be in the

24  hundreds of million, billions of dollars in most cases.  It

25  just doesn't happen in these cases because it's just such an

1    enormous, astronomical figure when you do the math.

2        In this case, there were --

3        **THE COURT:**  I don't actually really know what that

4    means.  Let's just talk about this case.  All right?  I'm not

5    sitting in review of TCPA practice nationally.  I have your

6    case and your facts, and I want you to address those

7    specifically.

8        So, last shot.

9        **MR. ROTH:**  Your Honor --

10       **THE COURT:**  Yes.

11       **MR. ROTH:**  -- I had one other point.

12       The TCPA doesn't carry with it a right to attorneys' fees.

13   So --

14       **THE COURT:**  I'm sorry.  Say that again.

15       **MR. ROTH:**  It does not have a right to attorneys'

16   fees.  So in a case that goes through judgment, a plaintiff

17   doesn't actually receive $500.  A significant portion of that

18   normally goes to the fees and costs in the suit.

19       **THE COURT:**  That's fine.  Then you should have built

20   that in.  That's an interesting factor.  So that's one thing

21   you should have said.  You didn't do it.  It's not in your

22   motion.  But the plaintiff didn't do that.  Okay?

23       So give me some grounds.  But you're not giving me any

24   grounds.

25       So maybe that's a factor.  Maybe after -- I'm assuming

1  that's true and no reason to disbelieve it.  Maybe as a

2  practical matter, you have a $500 award and it's a common fund

3  and the fees are going to come out of the pocket of the class

4  members because that's the only way the lawyers get paid.  And

5  that, as a matter of routine practice, takes it down

6  25 percent.  That's 25 percent right there.  Okay?  That's

7  fine.  That's the kind of stuff I need.

8       But these vague things about, "Oh, there's some risk" and

9  "Watch out, the FTC's coming," that does not help me on a

10  discount this steep.

11      Okay.  So preliminary approval is denied.  You can have

12  another opportunity to do it.  We'll give you 45 days, because

13  we've got to get this show on the road.  Okay?  So is that

14  going to be long enough?  I'll lay out all the datapoints in

15  the order so you don't have to worry about writing them down.

16      **MR. ROTH:**  That's what I was going to ask you.

17  Thank you, Your Honor.

18      **MR. HEDIN:**  Thank you, Your Honor.

19      **THE COURT:**  45 days.  Do you want to be set for trial

20  right now, or do you want to have another 45 days to try to

21  wrap this up?

22      **MR. HEDIN:**  Based on Your Honor's comments -- in the

23  joint status report we filed, we requested a ruling on the

24  pending motion to dismiss.  At this time, I guess we'd

25  reiterate that request and ask for the Court to issue the

1  ruling that it indicated --

2      **THE COURT:**  Well, here's the deal.  You can either

3  tell me you want 45 days or I just restore you to the full

4  calendar.  I'm not going to do little snippets here and there.

5  So if you want to get back on the calendar, I'll rule on the

6  motion, and I'll set you for trial probably in March or

7  something like that.

8      Now, if you want 45 days to try to settle, we're going to

9  keep it on ice until you go through that 45 days.

10      **MR. ROTH:**  There was actually an amended complaint

11  filed.  And the settlement agreement provides that if

12  preliminary approval is denied, we'd have 30 days to respond to

13  the first amended complaint.

14      The motion to dismiss --

15      **THE COURT:**  That's fine.  All I need you to tell me

16  is, do you want to try a third time or do you want to go back

17  and try -- that's all I'm asking you.  You can work out all the

18  details.

19      But here's your decision point.  Track A:  Back on track,

20  set a trial date, do the motions and, boom, we're done.  Or

21  Track B:  Do you want to put everything on chill for 45 more

22  days to see if you can settle?

23      **MR. ROTH:**  Could we file -- could I consult my client

24  and in seven days, file --

25      **THE COURT:**  Just tell me now.  This thing is dragging

1    out too long.

2         **MR. HEDIN:**  We'd like to get the case moving,

3    Your Honor.  And we're always happy to discuss settlement with

4    Eaze, if it would like to, while we litigate, but we'd like to

5    keep the case moving.

6         **THE COURT:**  Okay.  Plaintiff wants to go forward; so

7    that's what we'll do.

8         Okay.  Thank you.

9         **MR. HEDIN:**  Thank you, Your Honor.

10        (Proceedings adjourned at 10:38 a.m.)

11                        ---o0o---

12

13              <u>**CERTIFICATE OF REPORTER**</u>

14        I certify that the foregoing is a correct transcript

15   from the record of proceedings in the above-entitled matter.

16

17   DATE:  Friday, December 13, 2019

18

19

20

21   _____

22   Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, U.S. District Court

23

24

25